**UNITED STATES of America**

v.

**William E. MATHIES, Jr., Appellant.**

**No. 15085.**

United States Court of Appeals
Third Circuit.

Argued April 9, 1965.

Decided Sept. 28, 1965.

Melvin Schwartz, Cooper, Goodman & Schwartz, Pittsburgh, Pa. (Alexander Cooper, Pittsburgh, Pa., on the brief), for appellant.

Sebastian C. Pugliese, Jr., Asst. U. S. Atty., Pittsburgh, Pa. (Gustave Diamond, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before GANEY and FREEDMAN, Circuit Judges, and KIRKPATRICK, District Judge.

KIRKPATRICK, District Judge.

The appellant was convicted upon five of the six counts of an indictment charging violations of Title 18 U.S.C. § 152. Count 1 charged that, in contemplation of the bankruptcy of Pitt Wholesale Company, Inc., the defendant knowingly and fraudulently transferred and concealed "assets and property" belonging to that corporation. Counts 2, 3, 5 and 6 charged him with having made false oaths in the course of the bankruptcy proceedings. He was sentenced to three years imprisonment (concurrently) on each of the counts upon which he was convicted and fined $25,000. He moved for judgment of acquittal or, in the alternative, for a new trial and, from the Court's denial of his motion, took this appeal.

Involved in the transactions out of which the prosecution arose was a group of four corporations all of which were controlled or dominated by the appellant. One of them, Pitt Wholesale Company, Inc., the bankrupt, of which corporation the appellant was president, owned a warehouse and carried on a wholesale business about half of which consisted of sales to the other corporations. The appellant's principal business activity was running the wholesale business. He was also majority stockholder of Mathies and Sons, Inc., a corporation which owned all the stock of two other corporations which owned and operated retail stores (Bill's Bargain Stores Nos. 1 and 2) and which operated, as owner, Bill's Bargain Store No. 3, another retail establishment.

The appellant was indicted originally on May 9, 1961. On his motion, the indictment was dismissed by Judge Willson as to the charge of concealment of assets. Thereafter, on January 10, 1962, the Government reindicted the appellant upon the same charges. After the argument of his motion to dismiss and before any action by the Court, this second indictment was withdrawn by the Government. He was indicted for the third time upon the present indictment. On the appellant's motion to dismiss, Judge Miller, a third judge, sustained the indictment, and the case came on for trial before a fourth judge, Judge Sorg, resulting in the appellant's conviction. He now raises the point that Judge Miller erred in refusing to dismiss Count 1 contrary to the action taken by Judge Willson. It is to be noted, however, that the indictment which Judge Miller sustained was not the same indictment which had been dismissed by Judge Willson, nor was it identical in its charging language. Under the circumstances, the opinions of this and other courts disapproving judges sitting in the same court and in the same case overruling one another have no application. In any event, the rule was never intended to apply to a situation in which one judge, in a different case, merely declines to follow a rule of law enunciated by a colleague. Even in the same case, the rule "is not absolute and all-embracing in its scope." TCF Film Corporation v. Gourley, 3 Cir., 240 F.2d 711, 713.

The violations of which the appellant was convicted were all charged to have taken place between January 1, 1959, and March 22, 1960.

The only error complained of which calls for more than the briefest discussion is the Court's refusal to strike from the evidence a document identified as Government's Exhibit 45. The ruling as-

signed as error was made under the following circumstances:

The Government undertook to establish concealment as charged in Count 1 by proving the amount and value of the corporation's assets on hand at the beginning of the year 1959, adding thereto the value of merchandise and cash acquired during the year, subtracting the expenditures and goods sold during the same period and comparing the value of assets on hand at the end of the period with the starting figure. This was substantially the net worth procedure often used in tax fraud cases. Any substantial shortage thus developed, if unexplained, is recognized as evidence of concealment. Bisno v. United States, 9 Cir., 299 F.2d 711.

The principal witness upon this branch of the case was an accountant who had made an examination of such books and records of the corporation as had been turned over to the trustee. Based upon his testimony, the verdict of guilty necessarily involved the jury's finding that there was an unexplained shortage in "a substantial amount" [1] in the assets. In his opinion denying a new trial, the judge stated that the shortage amounted to the difference between $1,173,543.32 and $911,897.51 ($261,645.81), and there was evidence which, if competent and admissible, pointed to at least a very large shortage. The appellant did not testify and offered nothing to account for the discrepancy. There was also evidence (offered primarily in support of the false oaths counts) from which it could be inferred that on several occasions sums of money had been paid to the corporation which did not appear upon its books or in its bank account.

It goes without saying that the net worth procedure resorted to by the Government depended for its validity upon there being competent evidence of the amount and value of the assets of the bankrupt corporation at both the beginning and the end of the accounting period. The first of these figures was obtained from the corporation's tax return. The second, the Government's accountant got from the exhibit referred to above, which purported to be a report of an inventory and appraisal as of January 27, 1960, of the bankrupt corporation's assets, made by appraisers appointed in a state equity receivership proceeding which preceded the bankruptcy. This document, consisting of 38 typewritten sheets, contains a list of over a thousand items [2] of merchandise, fixtures and equipment. The first sheet (or cover), on which appear the signatures of the appraisers, gives five totals—merchandise at cost, merchandise at actual value, furniture and fixtures at warehouse and at office and autos—but no details. The remaining pages contain a complete itemization of the merchandise on hand with the value of each item or group of similar items.

When called to the stand to authenticate the document, neither of the appraisers was able to identify anything but his signature. Their testimony was that they had entered the detailed appraisal upon work sheets which they had turned over to the receiver and, at a later time, had gone to his office and signed the first page, apparently without looking at the other 37 sheets,[3] certainly without making any comparison of the typewritten pages with their work sheets. One of the appraisers testified that "the total figure" seemed, as he recalled, ap-

---

1. The Court charged, correctly, "It is sufficient under this count of the indictment if the government has proven beyond a reasonable doubt that the goods, wares and merchandise transferred, if any, were in a substantial amount."

2. The word "item" is used (as in the record) to mean a category or class of merchandise rather than a single article.

3. One of the appraisers stated that he had never seen those pages, though he speculated that they might have been copied from his work sheets. It does not even appear that the 37 pages were attached to the cover when it was signed.

proximately to correspond with the totals which they had on their sheets.

■ The argument for admissibility (which was apparently the basis upon which the judge allowed it to go to the jury) was that the document was a part of the official record of the case in the Court of Common Pleas of Allegheny County. Whether or not it was admissible under the Business Records Act, 28 U.S.C. 1732, it was at least prima facie admissible under the common law exception to the hearsay rule for judicial or official records.[4] However, it appeared that the entries were not made by the appraisers or at their direction or under their supervision and were not the work sheets upon which the appraisers first wrote down the various items of merchandise which they found in the warehouse, with their values. Those sheets were the only written record made by them, and there was no testimony and nothing to show that it was a copy. Thus, admissibility of the report as part of the record of a state court is no problem, but the question is whether, in the state of this record, this report should have been sent to the jury as embodying the work of the appraisers appointed to make the receiver's inventory.

We are of the opinion that the document (Exhibit 45) was not shown to be what it purported to be and, even though it could have been properly admitted as part of a judicial record when first offered, the Court should have granted the defendant's motion to have the exhibit "taken from the evidence" as soon as it appeared from the testimony of the appraisers that it was not their work and that no proof would be forthcoming that it was a copy.

■ The question remains whether and to what extent the error was prejudicial. The net worth method was approved by the Supreme Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, but the opinion enjoins caution in making use of it. The Court pointed out that "an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth," a statement equally true of a closing net worth. It certainly is not unreasonable to require that, when the Government's case in a criminal prosecution consists of circumstantial evidence developed by a mathematical process, there should be no uncertainty about the data on which the process is built, and in this case, beyond one or two rather vague inferences, there is very little, if anything, in the evidence, other than the inventory, to show the amount and value of assets on hand at the end of the accounting period. There is nothing at all to identify any particular merchandise on hand.

■ Even though it might be possible to sustain a conviction under Count 1 without the entire document under discussion, its admission into evidence was unquestionably prejudicial to the appellant's defense to that count and would require a reversal of the judgment. Not only is a detailed inventory which sets forth lists of specific items, actually seen, counted and valued by official appraisers, usually far more convincing to a jury than testimony as to a lump sum figure, but in this case the accountant used entries on the unauthenticated sheets as an example fortifying his general conclusions. He testified to an unexplained shortage of 80 bicycles. This particular shortage could not have been proved at all without the end inventory.

■ As to the remaining counts. An essential element of the offense of mak-

4. It is well settled that the mode of authenticating records of state courts provided by Title 28 U.S.C. § 1738 is not exclusive and a record produced in court by its official custodian requires no further authentication. A "document containing an official inventory and appraisement" was held by this Court in Kay v. Federal Rubber Co., 3 Cir., 60 F.2d 454, to have been properly admitted, but that decision falls short of supporting the judge's ruling in the present case, because one of the appraisers testified that the values appearing in the document had been placed there by him.

 

ing a false oath in bankruptcy proceedings is that the false oath be made with a fraudulent intent. The statute specifically so provides. In his charge the judge told the jury six or seven times that they could not convict unless they believed the defendant's false swearing was done with a fraudulent intent.

Despite a divergence of opinion in other circuits, this Court held that proof that a false oath on a material matter was knowingly and intentionally made, without more, is not enough to convict. In In re Topper, 3 Cir., 229 F.2d 691, this Court held it to be error to refuse a discharge to a bankrupt [5] who had admittedly knowingly sworn to false schedules, because the trustee was bound to produce something more to show fraudulent intent. In the opinion, Judge Kalodner quoted Thompson v. Eck, 2 Cir., 149 F.2d 631, in which the Court suggested that the fact that a bankrupt makes out his schedules on his attorney's advice "is ordinarily enough to show that the necessary (fraudulent) intent is lacking."

■ It is inconceivable that a jury, having been instructed that there was evidence in the case upon which, if believed, they could find the defendant guilty of a deliberate course of conduct carried on for a year for the purpose of concealing his assets and defrauding his creditors and having found him guilty of that offense, would have failed to find fraudulent intent in his making a false oath, the result of which would be to further his scheme of concealment. We think, therefore, that the error in admitting the inventory used in obtaining the conviction under Count 1 so pervaded the entire trial that a new trial is required upon Counts 2, 3, 5 and 6.

The appellant complains of a number of matters connected with the conduct of the trial, by the judge and the prosecuting attorney, which, he claims, worked to deprive him of a fair and impartial trial. We have examined the record and find the appellant's points without merit and, in view of the fact that we are ordering a new trial, we do not deem it necessary or profitable to discuss them in detail. It may be well, however, to state that in our opinion Exhibits 5 through 12, 18, and 48 were properly admitted.

For the reasons stated, the judgment convicting the appellant on Counts 1, 2, 3, 5 and 6 will be reversed and the case remanded for a new trial.

---

5. The Bankruptcy Act denies a discharge to a bankrupt who has violated this provision of 18 U.S.C. § 151.