# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 20, 2007

Charles R. Fulbruge III
Clerk

No. 06-50709

ENRIQUE PONCE, JR; ROCIO PONCE, Individually and as next friends of
E.P., a minor child

                                        Plaintiffs - Appellees

v.

SOCORRO INDEPENDENT SCHOOL DISTRICT

                                        Defendant - Appellant

---

Appeal from the United States District Court
for the Western District of Texas

---

Before JOLLY, STEWART, and PRADO, Circuit Judges.

E. GRADY JOLLY, Circuit Judge.

This appeal presents the question of whether student speech that threatens a Columbine-style attack on a school is protected by the First Amendment. Today we follow the lead of the United States Supreme Court in Morse v. Frederick, 127 S.Ct. 2618 (2007), and hold that it is not because such speech poses a direct threat to the physical safety of the school population. We therefore VACATE the preliminary injunction entered by the district court and REMAND for further proceedings, if appropriate.

I.

While enrolled as a sophomore at Montwood High School, a minor student identified as E.P. kept an extended notebook diary, written in the first-person perspective, in which he detailed the "author's" creation of a pseudo-Nazi group on the Montwood High School Campus, and at other schools in the Socorro Independent School District ("SISD" or "School District"). The notebook describes several incidents involving the pseudo-Nazi group, including one in which the author ordered his group "to brutally injure two homosexuals and seven colored" people and another in which the author describes punishing another student by setting his house on fire and "brutally murder[ing]" his dog. The notebook also details the group's plan to commit a "[C]olumbine shooting" attack on Montwood High School or a coordinated "shooting at all the [district's] schools at the same time." At several points in the journal, the author expresses the feeling that his "anger has the best of [him]" and that "it will get to the point where [he] will no longer have control." The author predicts that this outburst will occur on the day that his close friends at the school graduate.

On August 15, 2005, E.P. told another student (the "informing student") about the notebook and supposedly showed him some of its contents. The informing student told a teacher about the notebook. After waiting a day, the teacher told Assistant Principal Jesus Aguirre ("Aguirre") about the notebook. Aguirre called the informing student into his office and questioned the student about the conversation with E.P. Aguirre then decided to call E.P. into his office for a meeting.

During the meeting, Aguirre told E.P. that students had complained to him that E.P. was writing threats in his diary. E.P. denied these accusations and instead explained that he was writing a work of fiction. Aguirre asked E.P. for permission to search his backpack and E.P. consented. Aguirre discovered the notebook and briefly reviewed its contents. E.P. continued to maintain that the notebook was a work of fiction.

Aguirre called E.P.'s mother to tell her about the notebook. She too maintained that the notebook was fiction, and explained that she also engaged in creative writing. Aguirre informed her that he would read the notebook in detail and "call her the next day with an administrative decision based on the safety and security of the student body." Aguirre then released E.P. back into the general student population to complete the school day. Aguirre took the notebook home and read it several times. He found several lines in the notebook alarming and ultimately determined that E.P.'s writing posed a "terroristic threat" to the safety and security of the students and the campus.

As a "terroristic threat," Aguirre determined that the writing violated the Student Code of Conduct. He therefore suspended E.P. from school three days and recommended that he be placed in the school's alternative education program at KEYS Academy.[1] E.P.'s parents unsuccessfully appealed the decision to the Principal of the Montwood High School, the Assistant Superintendent of Instructional Services, and finally to the School Board's designated committee. To prevent E.P. from being transferred to KEYS Academy, E.P.'s parents placed him in private school, where he completed his sophomore year without incident.

E.P.'s mother explained that the decision to transfer E.P. to a private school was based upon the concern that the school's finding that E.P. made a terroristic threat and violated the Student Code of Conduct would become part of his permanent school record and follow him to any other district to which he might transfer. Such a record would require that E.P. attend an alternative education program, like that at KEYS Academy, and deprive E.P. of the ability to participate in musical education programs. E.P.'s mother worried that this

---

[1] The day after reading the notebook, Aguirre called the El Paso Police Department and had E.P. arrested. After reviewing the case, the El Paso County Attorney's Office declined to prosecute.

record would affect E.P.'s ability to gain admission to the college of his choice, especially because he intends to major in music while attending college. Thus, in an effort to ensure that E.P. can return to Montwood High School with a clean record, E.P.'s parents filed the instant lawsuit in January 2006.

E.P.'s parents sued SISD under 42 U.S.C. § 1983 alleging violations of E.P.'s First, Fourth, and Fourteenth Amendment rights and analogous provisions under the Texas Constitution. E.P.'s parents also moved to enjoin the School District: from placing him at KEYS Academy, from informing third parties that E.P. had planned to commit violence, from discussing the contents of his writing without his consent, and from retaining any reference to the infraction in his school record. On May 2, 2006, the district court granted a preliminary injunction on First Amendment grounds. The court held that under the Supreme Court's Tinker standard, the evidence was insufficient to prove that SISD acted upon a reasonable belief that disruption would occur. See Tinker v. Des Moines Indep. Comty. Sch. Dist., 393 U.S. 503, 514 (1969) (holding that school officials must justify their decision to punish student speech by showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.").

On appeal, the School District challenges the preliminary injunction. We review the district court's decision to grant a preliminary injunction for an abuse of discretion; the legal principles upon which the decision is grounded, however, are reviewed de novo. Women's Med. Ctr. of Nw. Houston v. Bell, 248 F.3d 411, 418–19 (5th Cir. 2001).

## II.

As a threshold matter, SISD argues that the district court erred in finding that E.P. and his parents have standing to bring this lawsuit. SISD maintains that under our precedent, a student does not have standing to bring a federal action challenging his transfer to an alternative education program. In Nevares

v. San Marcos Consolidated Independent School District, the student plaintiff challenged the constitutionality of a Texas statute which permitted his assignment to an alternative education program. 111 F.3d 25, 26 (5th Cir. 1997). He argued that because the statute permitted him to be transferred without a hearing, it deprived him of a protected property or liberty interest. Id. After noting that the student had not been denied access to public education, even temporarily, we concluded that no protected interest is implicated in the decision to transfer a student into an alternate education program and dismissed the case for lack of standing. Id. As the district court correctly noted, Nevares is not applicable here. The Ponces' standing does not rest on a claim that E.P.'s due process rights would be violated by the transfer to KEYS Academy. Instead, the Ponces challenge the ability of the school to punish E.P. based on the content of his journal -- whether the form of that punishment was a suspension, a notation in his permanent record, or a school transfer -- because, they argue, such punishment would violate E.P.'s First Amendment rights. Accordingly, the Ponces had standing to pursue a preliminary injunction to prevent SISD from imposing a punishment.

III.

A preliminary injunction requires that "the applicant . . . show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." Lake Charles Diesel, Inc. v. General Motors Corp., 328 F.3d 192, 195–96 (5th Cir. 2003). Our analysis begins—and ends—with the first requirement. There is not, on the record before us, a substantial likelihood that the Ponces can succeed on the merits of their First Amendment claim.

We are guided by the Supreme Court's recent decision in Morse v. Frederick, 127 S.Ct. 2618 (2007). But before applying Morse to the case before us, some extended analysis of the case and particularly of Justice Alito's concurring, and controlling, opinion is necessary. That concurring opinion appears to have two primary purposes: providing specificity to the rule announced by the majority opinion, and, relatedly, ensuring that political speech will remain protected within the school setting. Taken together, the majority and concurring opinions in Morse explain well why the actions of the school administrators here satisfy the requirements of the First Amendment.

In Morse, a student at Juneau-Douglas High School unfurled a 14-foot banner bearing the phrase "BONG HiTS 4 JESUS" during a school-sanctioned and supervised event. Id. at 2622. The principal confiscated the banner and suspended Frederick. Id. Frederick filed suit under 42 U.S.C. § 1983 against the principal and the School Board, claiming that the principal's actions violated his First Amendment rights. Id. at 2623. Applying the standard first set out in Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), the Ninth Circuit agreed, concluding that the school punished Frederick without demonstrating that his speech gave rise to a risk of substantial disruption. See Frederick v. Morse, 439 F.3d 1114, 1123 (9th Cir. 2006).

The Supreme Court reversed, holding that Frederick's suspension violated no constitutional right. In reaching this conclusion, the Court expressly declined to apply the Tinker standard of "risk of substantial disturbance" to drug speech. See Morse, 127 S.Ct. at 2627. The Court's refusal to apply Tinker rested on the relative magnitude of the interest it considered to be at stake, viz., prevention of the "serious and palpable" danger that drug abuse presents to the health and well-being of students. Id. at 2629. Because the already significant harms of drug use are multiplied in a school environment, the Court found "that deterring drug use by schoolchildren is an 'important–indeed, perhaps compelling'

6

interest," id. at 2628 (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 661 (1995)), not arising from an "undifferentiated fear or apprehension of disturbance" or "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," as was the case in Tinker. 393 U.S. at 508, 509. Accordingly, on the Court's reasoning, school administrators need not evaluate the potential for disruption caused by speech advocating drug use; it is per se unprotected because of the scope of the harm it potentially foments.

The Court's evaluation of the harm led to an evidently potent remedy. To the extent that preventing a harmful activity may be classified as an "important—indeed, perhaps compelling interest," speech advocating that activity may be prohibited by school administrators with little further inquiry. But the Court did not provide a detailed account of how the particular harms of a given activity add up to an interest sufficiently compelling to forego Tinker analysis. As a result of this ambiguity, speech advocating an activity entailing arguably marginal harms may be included within the circle of the majority's rule. Political speech in the school setting, the important constitutional value Tinker sought to protect, could thereby be compromised by overly-anxious administrators.

It is against this background of ambiguity that Justice Alito's concurring opinion opens. It begins by making two interpretive points about the majority opinion:

> (a) [the majority opinion] goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as the wisdom of the war on drugs or of legalizing marijuana for medicinal use.

Morse, 127 S.Ct. at 2636 (Alito, J., concurring) (internal citation and quotation marks omitted). By making these points, the concurring opinion makes clear

from the outset that the majority is focused on the particular harm to students of speech advocating drug use; the concurring opinion is not itself announcing a general rule defining the requirements for applying Tinker whenever the safety of the school population is threatened in some other context. On this reading, the majority opinion "does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions." Id. at 2637 (emphasis added). But importantly, Justice Alito's concurring opinion goes on to expound with further clarity why some harms are in fact so great in the school setting that requiring a school administrator to evaluate their disruptive potential is unnecessary. In doing so it provides the specificity necessary for determining the harms that are so serious as to merit the Morse analysis.

> The central paragraph of Justice Alito's concurring opinion states:
>
> [A]ny argument for altering the usual free speech rules in the public schools cannot rest on a theory of delegation but must instead be based on some special characteristic of the school setting. The special characteristic that is relevant in this case is the threat to the physical safety of students. School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate. Similarly, students, when not in school, may be able to avoid threatening individuals and situations. During school hours, however, parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted. Students may be compelled on a daily basis to spend time at close quarters with other students who may do them harm. Experience shows that schools can be places of special danger.

Id. at 2638 (emphasis added). On Justice Alito's analysis, the heightened vulnerability of students arising from the lack of parental protection and the close proximity of students with one another make schools places of "special danger" to the physical safety of the student. Id. And it is this particular threat

that functions as the basis for restricting the First Amendment in schools: "school officials must have greater authority to intervene before speech leads to violence." Id. The limits of that authority are often, but not always, adequately determined by Tinker, which "in most cases . . . permits school officials to step in before actual violence erupts." Id. As such, Tinker will not always allow school officials to respond to threats of violence appropriately.

The concurring opinion therefore makes explicit that which remains latent in the majority opinion: speech advocating a harm that is demonstrably grave and that derives that gravity from the "special danger" to the physical safety of students arising from the school environment is unprotected. But, because this is a content-based regulation, the concurring opinion is at pains to point out that the reasoning of the court cannot be extended to other kinds of regulations of content, for permitting such content-based regulation is indeed at "the far reaches of what the First Amendment permits." Id. Instead, Tinker's focus on the result of speech rather than its content remains the prevailing norm. The protection of the First Amendment in public schools is thereby preserved.

The constitutional concerns of this case—focusing on content—fall precisely within the student speech area demarcated by Justice Alito in Morse. That area consists of speech pertaining to grave harms arising from the particular character of the school setting. The speech in question here is not about violence aimed at specific persons,[2] but of violence bearing the stamp of a well-known pattern of recent historic activity: mass, systematic school-shootings

---

[2] Two post-Morse cases are instructive on this point. In Boim v. Fulton County School District, 494 F.3d 978 (11th Cir. 2007) and Wisniewski v. Board of Education of the Weedsport Central School District, 494 F.3d 34 (2d Cir. 2007), threats of violence to individual teachers were analyzed under Tinker. Such threats, because they are relatively discrete in scope and directed at adults, do not amount to the heightened level of harm that was the focus of both the majority opinion and Justice Alito's concurring opinion in Morse. The harm of a mass school shooting is, by contrast, so devastating and so particular to schools that Morse analysis is appropriate.

in the style that has become painfully familiar in the United States. LaVine v. Blaine Sch. Dist., 257 F.3d 981, 987 (9th Cir. 2001) ("[W]e live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis."). Such shootings exhibit the character that the concurring opinion identifies as particular to schools. As the concurring opinion points out, school attendance results in the creation of an essentially captive group of persons protected only by the limited personnel of the school itself. See Morse, 127 S.Ct. at 2638. This environment makes it possible for a single armed student to cause massive harm to his or her fellow students with little restraint and perhaps even less forewarning. Indeed, the difficulty of identifying warning signs in the various instances of school shootings across the country is intrinsic to the harm itself. Cf. LaVine, 257 F.3d at 987 ("After Columbine, Thurston, Santee and other school shootings, questions have been asked how teachers or administrators could have missed telltale 'warning signs,' why something was not done earlier and what should be done to prevent such tragedies from happening again."). We therefore "find it untenable in the wake of Columbine and Jonesboro that any reasonable school official who came into possession of [E.P.'s diary] would not have taken some action based on its violent and disturbing content." Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 626 n. 4 (8th Cir. 2002). Our recent history demonstrates that threats of an attack on a school and its students must be taken seriously.[3]

---

[3] With respect to the reasonableness of an administrator's actions, it is of great import that the *Morse* Court's opinion specifically did not turn on Frederick's motive for displaying the banner, which was that "he just wanted to get on television." *Morse*, 127 S.Ct. at 2625. Instead, the Court considered how the banner would likely be interpreted by its viewers, *id.* at 2624-25, finding that it was reasonable for the principal to conclude that "failing to act would send a powerful message to the students in her charge ... about how serious the school was about the dangers of illegal drug use." *Id.* at 2629. Thus here, where E.P. contended that his writings were mere fiction that posed no real threat, it was reasonable for Aguirre to conclude that failing to respond to E.P.'s diary would not only place E.P. and other students at risk of physical danger if the intent expressed in the diary was actualized, but would also send a message to E.P. and to the informing student that the school

Lack of forewarning and the frequent setting within schools give mass shootings the unique indicia that the concurring opinion found compelling with respect to drug use. If school administrators are permitted to prohibit student speech that advocates illegal drug use because "illegal drug use presents a grave and in many ways unique threat to the physical safety of students," Morse, 127 S.Ct. at 2638, then it defies logical extrapolation to hold school administrators to a stricter standard with respect to speech that gravely and uniquely threatens violence, including massive deaths, to the school population as a whole.[4]

Of course, we do not remotely suggest that "schools can[] expel students just because they are 'loners,' wear black and play video games." LaVine, 257 F.3d at 987. We do hold, however, that when a student threatens violence against a student body, his words are as much beyond the constitutional pale as yelling "fire" in crowded theater, see Schenck v. United States, 249 U.S. 47, 52 (1919), and such specific threatening speech to a school or its population is unprotected by the First Amendment. School administrators must be permitted to react quickly and decisively to address a threat of physical violence against

---

administration would tolerate violent threats against the student body. Aguirre did not punish E.P. for speech because it was in conflict with his vision of the school's "educational mission," *id.* at 2637 (Alito, J., concurring), nor out of a "mere desire to avoid ... discomfort and unpleasantness." *Tinker*, 393 U.S. at 509. He acted in response to a danger that, like drug use, "is far more serious and palpable." *Morse*, 127 S.Ct. at 2629.

[4] And in fact, the dissenting justices in Morse presumably would agree that the content of E.P.'s speech is unprotected. See Morse, 127 S.Ct. at 2644 (Stevens, J., dissenting) ("In my judgment, the First Amendment protects student speech if the message itself neither violates a permissible rule nor expressly advocates conduct that is illegal and harmful to students.") (emphasis added). The expressly violent content of E.P.'s diary is not the kind of political speech that "implicat[es] concerns at the heart of the First Amendment." Id. at 2626. "The students [in Tinker] sought to engage in political speech, using the armbands to express 'their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them.'" Id. (quoting Tinker, 393 U.S. at 514). In contrast, E.P.'s diary is much more characteristic of threat speech, which the Supreme Court has held that the government may proscribe without offending the First Amendment. See Watts v. United States, 394 U.S. 705 (1969).

their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance.

IV.

Because we conclude that no constitutional violation has occurred, our inquiry ends here. But cf. LaVine, 257 F.3d at 992 (finding no constitutional violation in emergency expulsion, but holding that school could not maintain negative documentation in student's file). Our role is to enforce constitutional rights, not "to set aside decisions of the school administrators which [we] may view as lacking a basis in wisdom or compassion." Wood v. Strickland, 420 U.S. 308, 326 (1975).[5] Because the journal's threatening language is not protected by the First Amendment, SISD's disciplinary action against E.P. violated no protected right and, accordingly, the Ponces have failed to show that they have a "substantial likelihood" of success on the merits.

Accordingly, the preliminary injunction is VACATED and the case is REMANDED to the district court for further proceedings not inconsistent with this holding.

VACATED AND REMANDED.

---

[5] And in this case, no such action would be necessary. Counsel for SISD represented at oral argument that transfer to the alternative education program is rarely permanent, and that the school would continue to evaluate E.P. to determine when he could be readmitted safely to Montwood High School.