**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-1988

_____

NIGEL ST. IVAN SINGH,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

_____

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge: Honorable Edward R. Grant
(No. A035-479-111)

_____

Argued March 6, 2011

Before: SCIRICA, AMBRO, and VAN ANTWERPEN,
Circuit Judges

(Opinion Filed:  April 16, 2012)

Thomas E. Moseley, Esq. **[ARGUED]**

1 Gateway Center, Suite 2600
Newark, New Jersey 07102
          *Counsel for Petitioner*

Tony West, Esq.
David V. Bernal, Esq.
Jesse M. Bless, Esq. **[ARGUED]**
Office of Immigration Litigation, Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
          *Counsel for Respondent*

_____

OPINION OF THE COURT

_____

VAN ANTWERPEN, *Circuit Judge*.

Nigel Singh petitions for review of a final order of removal based on his conviction, under 18 U.S.C § 152(3), for knowingly making a false statement under penalty of perjury in a bankruptcy proceeding. The Board of Immigration Appeals (BIA) determined that Singh's conviction was an offense involving fraud or deceit in which the loss to the victim exceeded $10,000, and hence an aggravated felony under 8 U.S.C. § 1101(a)(43)(M)(i). In his petition, Singh argues that 18 U.S.C § 152(3) is a perjury offense that must meet the requirements for perjury-based aggravated felonies under 8 U.S.C § 1101(a)(43)(S). Singh further argues that, even if assessed under 8 U.S.C § 1101(a)(43)(M)(i), he is not removable because his offense did not cause an actual loss exceeding $10,000. While we

2

reject Singh's first argument, we agree that under the unique facts of this case his offense did not cause an actual loss. Because we hold that § 1101(a)(43)(M)(i) requires an actual, not merely intended, loss, we will grant Singh's petition and vacate the order of removal.

## I. FACTS & PROCEDURAL HISTORY

Singh was born in Jamaica on August 23, 1959, and has been a lawful permanent resident of the United States since December 7, 1975. Since that time, Singh has married a U.S. citizen and raised three U.S. children. In 1997, Singh founded the Raeback Corporation, a construction contracting firm that bid on public works projects as a Minority Business Enterprise (MBE). During his tenure as Raeback's president, Singh was asked on several occasions by a business contact at a non-MBE firm, U.S. Rebar, to help U.S. Rebar secure government contracts. In exchange for kickbacks, Singh falsely attested that Raeback was serving as a subcontractor on government projects when, in fact, U.S. Rebar did the subcontract work. Under the scheme, billing was done in Raeback's name and the general contractor paid Raeback, which then forwarded the payments to U.S. Rebar, less a ten percent kickback. One of the government entities that funded these projects was the Port Authority of New York and New Jersey ("Port Authority").

In September 2005, during the course of the Port Authority project, Raeback filed for bankruptcy due to losses on another project. Since the bankruptcy proceedings automatically froze Raeback's bank accounts, Singh and his contact agreed on an arrangement in which the contact would deposit the general contractor's checks and hold the funds for

3

Singh during Raeback's bankruptcy.[1]  Unbeknownst to Singh, however, his contact was a confidential informant for the Port Authority, which had begun investigating U.S. Rebar's arrangement with Raeback.  Rather than holding the funds for Singh, therefore, the contact transferred the funds—approximately $54,000 in total—to the Port Authority.

When the Port Authority informed Singh of its investigation in 2007, Singh participated in two proffer sessions with law enforcement agents.  During these sessions, agents learned of Raeback's bankruptcy proceeding.  Agents also learned that Raeback's bankruptcy petition failed to disclose its revenue stream from the Port Authority project.  Although the Port Authority did not take legal action against Singh, Singh was charged by the U.S. Attorney's Office in the Eastern District of New York for one count of "fail[ing] to disclose all of Raeback's accounts receivable on Raeback's bankruptcy petition," in violation of 18 U.S.C. § 152(3).  Under § 152(3), it is a crime to "knowingly and fraudulently make[] a false declaration, certificate, verification, or statement under penalty of perjury" in relation to a bankruptcy proceeding.  On June 24, 2009, Singh pled guilty.  As part of the plea agreement, Singh agreed to "restitution in

---

[1] As noted in the Pre-Sentence Report (PSR), Singh "cashed $53,952.41 worth of checks through the confidential informant in order to hide these funds from creditors of Raeback."  App. at 209.  While the PSR does not specifically state that Singh had the general contractor send the checks directly to U.S. Rebar, a copy of one of the checks confirms that this was, in fact, the arrangement.  *See* App. at 156 (providing photocopy of $6,000 check from general contractor to U.S. Rebar).

the amount of $54,418.08," to be paid by transferring the money "held by the Port Authority" to the bankruptcy trustee.

At the time the plea agreement was entered, the U.S. Attorney believed Singh's failure to disclose the Port Authority funds had caused "substantial interference with the administration of justice," thus warranting a three-point sentencing enhancement under U.S.S.G. § 2J1.2(b)(2). Later, however, the U.S. Attorney informed the sentencing court that, "because the Chapter 11 bankruptcy proceedings are still ongoing and the bankruptcy trustee will receive the funds which the defendant attempted to secrete, the defendant's crime will not affect the ultimate outcome of the bankruptcy proceedings." App. at 298. The U.S. Attorney also informed the court that the trustee "did not expend any substantial additional resources as a result of the defendant's fraud." App. at 299. Based on these discoveries, the U.S. Attorney's Office dropped its request for the three-point enhancement. Singh, meanwhile, emphasized the restitution agreement as a factor supporting his request for a non-incarceratory sentence.

On December 14, 2009, the United States District Court for the Eastern District of New York sentenced Singh to ten months in prison. Although the court's initial judgment did not mention restitution, an amended judgment issued on January 29, 2010 included a restitution order "pursuant to [the] plea agreement." The terms of the court's restitution order, identical in all relevant respects to the terms Singh agreed to in the plea, ordered that "the $54,418.08 currently held by the Port [A]uthority" be transferred to the trustee. On March 22, 2010, the funds were transferred to the trustee, and on January 19, 2011, the trustee distributed Raeback's assets to its creditors.

5

Shortly after Singh began serving his sentence, the Department of Homeland Security (DHS) initiated removal proceedings by issuing him a Notice to Appear (NTA). In the NTA, the DHS charged that Singh's § 152(3) conviction involved a "loss or intended loss" to a victim or victims exceeding $10,000 and thus made him removable as an aggravated felon under 8 U.S.C. § 1227(a)(2)(A)(iii). App. at 343. Under § 1101(a)(43)(M)(i) (hereinafter, "subparagraph (M)(i)"), an aggravated felony is defined as an "offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." The Immigration Judge sustained DHS's charge and entered an order of removal, which the BIA affirmed on April 12, 2011. In an unpublished opinion, the BIA ruled that a conviction under § 152(3) "categorically involves fraud," as evident by our Court's determination of the crime's essential elements in *United States v. Mathies*, 350 F.2d 963 (3d Cir. 1965). The BIA also ruled that Singh's agreement to pay restitution and the sentencing court's restitution order provided clear and convincing evidence that Singh's offense caused a loss to the trustee exceeding $10,000.

After the BIA issued its order, we granted Singh's request for a stay so that we could consider his petition for review. In granting the stay, we cited the Second Circuit's decision in *Pierre v. Holder*, 588 F.3d 767 (2d Cir. 2009), where an intended loss exceeding $10,000 was held insufficient, as a matter of law, to satisfy the loss requirement of subparagraph (M)(i).

## II. LEGAL BACKGROUND

Although 8 U.S.C. § 1252(a)(2)(C) divests federal courts of jurisdiction to review orders of removal based on an alien's commission of an aggravated felony, this "jurisdiction-stripping provision" only applies if we are satisfied the petitioner is, in fact, an alien who has committed an aggravated felony. *Valansi v. Ashcroft*, 278 F.3d 203, 207 (3d Cir. 2002). Whether or not Singh committed an aggravated felony is a question of law which we review *de novo*. *Bobb v. Att'y Gen.*, 458 F.3d 213, 217 (3d Cir. 2006). While we generally defer to the BIA's reasonable interpretations of the INA, "[w]e do not defer to the BIA's determination of whether a crime constitutes an aggravated felony." *Henry v. Bureau of Immig. & Customs Enforcement*, 493 F.3d 303, 306 (3d Cir. 2007). We also will not affirm a BIA order if it cannot be sustained on the grounds upon which the BIA relied, unless "it is highly probable" that the omission or error did not affect the outcome. *Li Hua Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011).

Under the INA, "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). An aggravated felony under subparagraph (M)(i) has two distinct elements: (1) it must be a crime that "involves fraud or deceit," (2) "in which the loss to the victim or victims exceeds $10,000." To determine whether a crime involves fraud or deceit, we must employ a "categorical approach" in which we focus on the crime's statutory elements "rather than . . . the specific facts underlying the crime." *Kawashima v. Holder*, 132 S. Ct. 1166, 1172 (2012). By contrast, we must use a "circumstance-specific" approach to determine whether the alien's offense involved a loss to a victim(s) exceeding $10,000, *Nijhawan v. Holder*, 129 S. Ct. 2294, 2300 (2009);

7

*Kaplun v. Att'y Gen.*, 602 F.3d 260, 265 (3d Cir. 2010), wherein the loss must be "tethered" to the actual "offense of conviction," not "acquitted or dismissed counts or general conduct," *Nijhawan*, 129 S. Ct. at 2302; *Alaka v. Att'y Gen.*, 456 F.3d 88, 106–08 (3d Cir. 2006).

## III. DISCUSSION

### A.   Fraud or Deceit Requirement

We begin our analysis here by considering whether Singh was convicted of an offense that categorically involves fraud or deceit.  As the Supreme Court has recently made clear, a crime involves fraud or deceit if it "necessarily entail[s] fraudulent or deceitful conduct." *Kawashima*, 132 S. Ct. at 1172; *accord Valansi*, 278 F.3d at 210.  For the reasons that follow, we hold that a conviction under 18 U.S.C. § 152(3) necessarily entails deceit and therefore qualifies as a deceit offense under 8 U.S.C. § 1101(a)(43)(M)(i).

To violate 18 U.S.C. § 152(3), one must "knowingly and fraudulently make a false declaration . . . under penalty of perjury" in relation to a bankruptcy proceeding.  This Court has previously interpreted the phrase "knowingly and fraudulently" in § 152(3) as requiring an intent to defraud. *In re Topper*, 229 F.2d 691, 692 (3d Cir. 1956) (interpreting § 152(3) as requiring "actual intent on the part of the bankrupt to hinder, delay and defraud his creditors"); *see also Mathies*, 350 F.2d at 967.  As Singh correctly notes, however, the jurisdiction in which he was convicted (the Second Circuit) interprets § 152(3) differently than we do.  Under the Second Circuit's interpretation, "the words of the statute requiring that the testimony be given 'knowingly and fraudulently'

8

mean no more than an intentional untruth in a matter material to the issue which is itself material."[2] *In re Robinson*, 506 F.2d 1184, 1187 (2d Cir. 1974) (internal quotation marks omitted). In the Second Circuit, therefore, "only the basic requirements of perjury need to be proven."[3] *Id.* at 1189. Singh thus contends that the BIA erred in concluding that § 152(3) "categorically involves fraud." Even if Singh is correct, however, it would not change the result here because the Second Circuit's definition of § 152(3) necessarily requires deceit. As noted in *Kawashima*, the word "deceit" refers to "the act or process of deceiving (as by falsification, concealment or cheating)." 132 S. Ct. at 1172. The Second Circuit's element of "knowingly" making a "false statement" fits this definition.[4] Thus, irrespective of which statutory

---

[2] The Second Circuit's interpretation of § 152(3) is not necessarily at odds with the plain meaning of the word "fraudulently," as the word "fraudulent" has at least two distinctly different meanings. On one hand, a fraudulent statement is one that is "made . . . with the purpose or design to carry out a fraud." BLACK'S LAW DICTIONARY 596 (5th ed. 1979). A statement is also fraudulent, however, if it is made with the simple intent to deceive. *See id.* ("A statement, or claim, or document, is 'fraudulent' if it was falsely made, or caused to be made, with the intent to deceive.").

[3] Consistent with the Second Circuit's interpretation of § 152(3), the sentencing court did not require that the government prove, nor did Singh admit to, an intent to defraud.

[4] The Supreme Court addressed an analogous situation in *Kawashima*. There, the petitioner had been convicted of filing a false tax return under 26 U.S.C. § 7206(1), which

9

elements we use, § 152(3) qualifies under subparagraph (M)(i) as an offense that involves deceit.

## B.    Subparagraph (S) Considerations

Singh also argues that because the Second Circuit considers § 152(3) to be "essentially equivalent to a perjury statute," *Robinson*, 506 F.2d at 1189, he cannot be removable because his offense does not qualify under the INA's provision for perjury-based aggravated felonies, 8 U.S.C. § 1101(a)(43)(S) (hereinafter, "subparagraph (S)").[5]   Singh bases this position on Congress's purported intent when enacting subparagraph (S) and the "basic rule" that "the specific statutory provision . . . should prevail over the more general."  Appellant's Br. at 23.  This argument is at odds with our precedent.

As we made clear in *Valansi*, "[w]hen the statutory language [of the INA] has a clear meaning, we need not look further."  278 F.3d at 214.  In *Valansi*, the petitioner argued that her conviction for embezzlement was a theft offense and

established that the petitioner "knowingly and willfully submitted a tax return that was false as to a material matter." *Kawashima*, 132 S. Ct. at 1172.  The Supreme Court concluded that the offense necessarily involved deceit, irrespective of whether the statute actually used the word "deceit." *Id.*

[5] Under subparagraph (S), perjury offenses only qualify as aggravated felonies if they result in a "term of imprisonment [of] at least one year."  Singh does not qualify as an aggravated felon under subparagraph (S) because he only received a ten-month sentence.

could only be an aggravated felony if it satisfied the INA's specific criteria for theft offenses under subparagraph (G). *Id.* at 213. We rejected this "all-or-nothing" argument because the "plain meaning of [subparagraph (M)(i)] suggests that embezzlement with intent to defraud would qualify as an offense that 'involves fraud or deceit.'" *Id.* at 214. A similar situation applies here, as the plain meaning of subparagraph (M)(i) encompasses offenses, such as § 152(3), that involve knowingly making false statements. Under *Valansi* we need not look further.

## C. The Loss Requirement

We turn now to the issue of whether Singh's offense was one in which the loss to the victim exceeded $10,000. Our determination depends in part on whether the government must prove actual loss, or merely an intended or potential loss. We begin, therefore, by considering the meaning of subparagraph (M)(i)'s requirement that there be a "loss to the victim or victims." As we noted in granting Singh's request to stay removal, the Second Circuit holds that subparagraph (M)(i) requires the loss to be an actual one. *See Pierre*, 588 F.3d at 773 (citing *Ming Lam Sui v. INS*, 250 F.3d 105, 119 (2d Cir. 2001)). For the reasons that follow, we agree with the Second Circuit.

Since the INA does not define the term loss, we must interpret the word according to its ordinary meaning at the time Congress enacted subparagraph (M)(i). *See Robinson v. Napolitano*, 554 F.3d 358, 365 (3d Cir. 2009) ("'A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning at the time

11

Congress enacted the statute.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))). Thus, because subparagraph (M)(i) was enacted by Congress in 1994,[6] we will consider the ordinary meaning of loss as of that time.

The 1993 edition of *Webster's New International Dictionary* provides numerous definitions of loss, along with illustrative examples. Each of these definitions, and their corresponding examples, refer to loss that *actually* occurs. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1338 (1993). Loss is defined, for example, as: (a) "the act or fact of losing"; (b) "a person or thing or an amount that is lost"; (c) "the act or fact of failing to gain, win, obtain, or utilize"; (d) a "decrease in amount, magnitude, or degree"; (e) "the state or fact of being destroyed or placed beyond recovery"; and (f) "the amount of an insured's financial detriment due to the occurrence of a stipulated contingent event." Corresponding examples to illustrate these definitions include: (a) "loss of a leg"; (b) "killed, wounded, or captured soldiers"; (c) "loss of opportunity"; (d) "altitude loss"; (e) "loss of life in war"; and (f) financial detriment caused by "death, injury, destruction, or damage." Importantly, not one of these definitions or examples refers to *potential* loss; even where loss refers to a failure to gain, the loss is characterized as having already occurred (e.g., loss of a battle).

Consistent with *Webster's* definition, this Court stated in 1991 that the "ordinary meaning" of loss is "actual loss," not "probable" or "intended loss." *United States v. Kopp*, 951

---

[6] Immigration and Nationality Technical Corrections Act of 1994, Pub. L. No. 103-406, 108 Stat. 4305 (1994).

12

F.2d 521, 529 (3d Cir. 1991) (superseded by statute on other grounds). We conclude, therefore, that when Congress enacted subparagraph (M)(i), the plain meaning of loss referred to actual, not merely intended, loss. Accordingly, because neither subparagraph (M)(i) nor paragraph (43) expand loss's ordinary meaning, we hold that subparagraph (M)(i) requires actual loss. *Accord Kharana v. Gonzales*, 487 F.3d 1280, 1282 n.3 (9th Cir. 2007) ("[I]nterpreting § 101(a)(43)(M)(i) such that a conviction involving an unsuccessful attempt to obtain more than $10,000 counts as a conviction 'in which the loss to the victim or victims exceeds $10,000' flies in the face of the plain meaning of the statute.").

Although some have argued that subparagraph (M)(i) should include intended loss, the reasons for overriding the statute's plain meaning are unconvincing. The concurrence in *Kharana* advanced the argument, for example, that because loss under subparagraph (U) has been interpreted to include intended loss, *see Matter of S-I-K*, 24 I. & N. Dec. 324 (BIA 2007) and *Matter of Onyido*, 22 I. & N. Dec. 552 (BIA 1999), loss under subparagraph (M)(i) should be read to include intended loss as well.[7] *Kharana*, 487 F.3d at 1286 (Wallace, J., concurring). The *Kharana* concurrence reasons that because subparagraph (U) does not provide "additional gloss" on the word, loss's meaning under (U) "applies with equal force" to subparagraph (M)(i). *Id.* There are several

---

[7] Because the government only charged Singh as removable under subparagraph (M)(i), we do not reach the question of whether intended loss satisfies the loss requirement for attempts or conspiracies to commit a deceit offense under subparagraph (U).

problems with this argument. Subparagraph (U) defines an aggravated felony as "an attempt or conspiracy to commit an offense described in this paragraph." 8 U.S.C. § 1101(a)(43)(U). Since subparagraph (U) does not mention the word loss, it is hardly significant that (U) does not provide "additional gloss" on the word itself. Further, we question the premise that subparagraph (U) does not provide any additional gloss. After all, the reason the BIA interpreted subparagraph (U) to include intended loss is because (U) includes the word "attempt," a word not present in (M). *See Onyido*, 22 I. & N. at 553. There is a clear textual reason, therefore, why loss under subparagraph (U) should not "apply with equal force" to subparagraph (M)(i). Whereas subparagraph (U) expressly applies to *attempts and conspiracies* to commit crimes of deceit, subparagraph (M)(i) applies to *consummated* crimes of deceit. The BIA determined that intended loss is relevant under subparagraph (U) because, by definition, an attempt to commit a crime does not require the crime to be successfully carried out. *See id.* This rationale does not apply to completed offenses under subparagraph (M)(i). In short, the fact that the BIA has held that actual loss is unnecessary under subparagraph (U), does not mean that actual loss must be unnecessary under (M)(i).

Along with the *Kharana* concurrence, the Seventh Circuit has suggested, in dicta, that subparagraph (M)(i) should be interpreted to encompass intended loss. *See Eke v. Mukasey*, 512 F.3d 372, 380 (7th Cir. 2008). The Seventh Circuit suggests that this interpretation would be reasonable because it is consistent with the Sentencing Guidelines' definition of loss for fraud and deceit crimes under U.S.S.G. § 2B1.1. *Id.* This argument is also unpersuasive. The statutory language of subparagraph (M)(i) provides no indication that

14

Congress wanted loss to be defined in accordance with the Sentencing Guidelines. As the *Kharana* concurrence observed, the Guidelines and the INA are like "apples and oranges." *See Kharana*, 487 F.3d at 1287 (Wallace, J., concurring). Not only are they written by different bodies (one by a non-legislative commission, one by Congress), but they serve distinctly different purposes (one penological, one civil).[8] Although we have recognized that there might be occasions where the Guidelines can help "divine Congress's intent when passing the INA," no such guidance is necessary when the INA's statutory language "has a clear meaning." *Valansi*, 278 F.3d at 213–14. Indeed, "[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." *Rubin v. United States*, 499 U.S. 424, 430 (1981) (citations omitted). Here, there are no rare or exceptional circumstances that compel us to override subparagraph (M)(i)'s plain meaning.

## D.    The Actual Loss from Singh's Offense

Having determined that subparagraph (M)(i) requires actual loss, we now turn to the "specific circumstances" of Singh's offense to determine if the government has proved by "clear and convincing" evidence that his offense involved an actual loss to a victim, or victims, that exceeds $10,000. *Nijhawan*, 129 S. Ct. at 2302–03. We begin by laying out the parameters of the circumstance-specific approach.

---

[8] It is instructive to note, for example, that the inclusion of intended loss in the Guidelines' definition of loss was based on the Guidelines' "overall theory of culpability for *attempts*." *Kopp*, 951 F.2d at 529 (emphasis added).

15

Although "not an invitation to relitigate the conviction itself," *Kaplun*, 602 F.3d at 266, the circumstance-specific approach goes beyond the "modified-categorical approach" that is used for determining which elements of a disjunctive statute an individual was convicted of committing. *See Nijhawan*, 129 S. Ct. at 2302 (citing *Shepard v. United States*, 544 U.S. 13 (2005) and *Taylor v. United States*, 495 U.S. 575 (1990)). For example, whereas the modified-categorical approach is limited to the record of conviction (e.g., indictment, plea agreement, criminal judgment, etc) and judicial findings of fact, *Alaka*, 456 F.3d at 106, the circumstance-specific approach may consider "sentencing-related material," *Nijhawan*, 129 S. Ct. at 2302–03. *Accord Matter of Babaisakov*, 24 I. & N. Dec. 306, 306 (BIA 2007). The guiding principle for the circumstance-specific analysis is that immigration courts must use "fundamentally fair procedures, including procedures that give an alien a fair opportunity to dispute a Government claim that a prior conviction involved a fraud with the relevant loss to victims." *Nijhawan*, 129 S. Ct. at 2303.

Here, the government argues that the circumstance-specific approach proves the existence of a loss that exceeds $10,000. The government's primary argument is that, on its face, the restitution order is clear and convincing evidence of actual loss because restitution orders are limited to "actual losses that resulted from the offense of conviction." Gov't Br. at 28. The government also argues that the circumstances of the case prove that Singh caused an actual, if temporary, deprivation of $54,000 of assets to the bankruptcy trustee.

### 1. The Restitution Order

16

According to the government, the very fact that the sentencing court issued a restitution order of $54,000 is proof positive that the requisite actual loss occurred.[9] The government reaches this conclusion based on a misapplication of the federal statutes governing restitution orders by federal courts: the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, and the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663.[10] Under the MVRA, a federal sentencing court "shall order" restitution for certain offenses, but only if the court finds that "an identifiable victim or victims has suffered a physical injury or pecuniary loss" as a "direct[] and proximate[]" result of the offense. §§ 3663A(a)(2), (c)(1)(B). Offenses involving "fraud or deceit" are included under the MVRA, § 3663A(c)(1)(A), and, as the government notes, violations of § 152(3) have "generally"

---

[9] The BIA made this argument in its opinion as well. However, in contrast to the BIA (which devoted just one sentence to the issue), the government made this the centerpiece of its case. Accordingly, we focus our analysis here on the government's argument.

[10] As set forth in 18 U.S.C. § 3556, "[t]he court, in imposing a sentence on a defendant who has been found guilty of an offense shall order restitution in accordance with section 3663A [the MVRA], and may order restitution in accordance with section 3663 [the VWPA]. The procedures under section 3664 shall apply to all orders of restitution under this section." Thus, if an offense qualifies under the MVRA, the sentencing court must order restitution. Only if the offense does not qualify under the MVRA does a court have permissive authority to grant restitution under the VWPA.

17

qualified as such.[11] Further, as the government points out, courts ordering restitution under the MVRA are limited to remedying the actual loss caused by the defendant's "offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990).[12] Ergo, the government concludes that the sentencing court's restitution order of $54,000 here is *ipso facto* evidence that Singh caused an actual loss to a victim exceeding $10,000.

The government's argument fails, however, for three reasons. First, its reliance on the MVRA is misplaced because the record shows that the sentencing court issued restitution pursuant to an express agreement by the parties, not the MVRA. Second, the law governing restitution issued *pursuant to a party agreement* shows that such orders are not limited to actual losses from the offense of conviction. Third, even if the court's restitution order reflected a judicial finding of loss, *Nijhawan* and our own precedent make clear that we

---

[11] Gov't Br. at 27–28 (citing *Feldman*, 338 F.3d at 219–20; *United States v. Waldner*, 580 F.3d 699, 709–10 (8th Cir. 2009); *United States v. Lovell*, 256 F.3d 463, 464 (7th Cir. 2001); *United States v. Grice*, 419 Fed. App'x 50, 52 (2d Cir. 2011) (unpublished)).

[12] Although *Hughey* was decided before the MVRA was enacted, the Second Circuit (the circuit in which Singh was convicted) has applied *Hughey*'s interpretation of the VWPA to the MVRA. *See United States v. Marino*, 654 F.3d 310, 319 n.7 (2d Cir. 2011) (citing *In re Local # 46 Metallic Lathers Union*, 568 F.3d 81, 86 (2d Cir. 2009) and *United States v. Oladimeji*, 463 F.3d 152, 158 n.1 (2d Cir. 2006)). Other federal circuits do so as well. *E.g.*, *United States v. Maturin*, 488 F.3d 657, 661 n.2 (5th Cir. 2007).

need not take the order at face value for removal purposes, particularly when, as here, it conflicts with undisputed facts in the sentencing material. We will address each of these three reasons in turn.

First, the government's reliance on the MVRA is misplaced because it is doubtful the sentencing court issued restitution under the MVRA. The sentencing court was only required to issue restitution under the MVRA if, and only if, the court determined that Singh's offense caused "a physical injury or pecuniary loss" to a "victim." § 3663A(c). This is significant because it is unlikely that the bankruptcy trustee here actually qualified as a victim under the MVRA. Although the government cites *United States v. Holthaus*, 486 F.3d 451, 457–58 (8th Cir. 2007), for the proposition that bankruptcy trustees can be victims of § 152(3) violations, it omits the fact that *Holthaus* limited this holding to trustees whose "compensation" has been "negatively impacted." *Id.* (adopting rule set forth by the Seventh Circuit in *United States v. Lowell*, 256 F.3d 463, 465–66 (7th Cir. 2001)); *see also United States v. Paradis*, 219 F.3d 22, 25 (1st Cir. 2000) (holding that trustee is not a victim of bankruptcy fraud under MVRA where defendant concealed funds that would go to the creditors). Here, the government agreed at sentencing that the trustee "did not expend any substantial additional resources as a result of the defendant's fraud." App. at 298–99. It is unlikely, therefore, that the sentencing court determined the trustee to be a victim with an actual loss under the MVRA, particularly since there is nothing in the record of conviction indicating it deliberated on this otherwise novel ruling.

Another factor suggesting that the MVRA was not the statutory framework for the restitution order is the fact that

19

the court expressly stated that it issued the order "pursuant to [the] plea agreement." App. at 195. This suggests the order was issued under § 3663(a)(3) of the VWPA, since that provision allows sentencing courts to order restitution "in *any* criminal case to the extent agreed to by the parties in a plea agreement." § 3663(a)(3) (emphasis added). Supporting this view is the fact that the sentencing court does not appear to have demonstrated its consideration of the statutory factors under 18 U.S.C. § 3664(a), as courts in the Second Circuit are required to do when issuing restitution in the absence of an agreement. *See United States v. Harris*, 79 F.3d 223, 232–33 (2d Cir. 1996). Accordingly, we do not agree with the government's argument that the sentencing court was required to, or did in fact, issue restitution pursuant to the MVRA.[13]

Second, the fact that the sentencing court issued its order "pursuant to [the] plea agreement" is significant because, in the Second Circuit, restitution is *not* limited to actual loss caused by the offense of conviction when issued pursuant to an agreement. *United States v. Silkowski*, 32 F.3d 682, 688–89 (2d Cir. 1994). This Court and several other courts of appeals have recognized this prevailing rule. *United States v. Akande*, 200 F.3d 136, 140 n.3 (3d Cir. 1999) ("Restitution is limited to amounts 'directly caused by the conduct composing the offense of conviction,' or those amounts that defendant 'expressly agree[s] to' pursuant to the

---

[13] The restitution provision in the plea agreement references both "18 U.S.C. §§ 3663 and 3663A." App. at 225. This suggests that the parties either (a) did not determine which statute applied to their agreement, or (b) deferred to the court's determination.

20

plea agreement." (quoting *Silkowski*, 32 F.3d at 689)); *United States v. Maturin*, 488 F.3d 657, 661 (5th Cir. 2007); *United States v. Broughton-Jones*, 71 F.3d 1143, 1147–48 (4th Cir. 1995); *United States v. Schrimsher*, 58 F.3d 610, 611 (11th Cir. 1995); *United States v. Soderling*, 970 F.2d 529, 533 (9th Cir. 1992). The government is thus incorrect when it asserts that "[u]nder either the MVRA or the VWPA, the restitution award can encompass only actual losses that resulted from the offense of conviction." Gov't Br. at 28 (citing *Hughey*, 495 U.S. at 420; *United States v. Zakhary*, 357 F.3d 186, 190–91 (2d Cir. 2004); *Feldman*, 338 F.3d at 220; *United States v. Badaracco*, 954 F.2d 928, 942 (3d Cir. 1992)). Importantly, all of the cases the government cites to support its position are cases where the court ordered restitution *in the absence of an agreement by the parties*.[14] *See Hughey*, 495 U.S. at 413–15; *Zakhary*, 357 F.3d at 188–89; *Feldman*, 338 F.3d at 214–15; *Badaracco*, 954 F.2d at 930. Accordingly, because the sentencing court ordered restitution pursuant to Singh's express agreement, the government's argument is based on inapposite law.

Third, to the extent that the restitution order reflects the sentencing court's determination of actual loss, *Nijhawan* and our precedent make clear that immigration courts are not bound to accept this determination at face value. Under

---

[14] The BIA made the same error. In its opinion, it cites *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001), for the proposition that "a court's power to order restitution is limited to actual loss." App. at 4. As with the cases cited by the government, the sentencing court in *Diaz* did not issue the restitution order pursuant to the parties' express agreement. *See Diaz*, 245 F.3d at 296.

21

*Nijhawan*, a restitution order must be assessed in the context of "conflicting evidence." 129 S. Ct. at 2303. Since the petitioner in *Nijhawan* did not point to "any" conflicting evidence, the Court ruled that a restitution order for $683 million coupled with the defendant's stipulation that his offense caused more than $100 million in loss was sufficient to meet the government's burden. *Id.* at 2298, 2303. Consistent with *Nijhawan*, we have taken the position that a restitution order "may be helpful" to the loss inquiry, but is not definitive. *Munroe v. Ashcroft*, 353 F.3d 225, 227 (3d Cir. 2003). In *Munroe*, the sentencing court issued an amended restitution order of $9,999 in a thinly veiled attempt "to alter the effect of the conviction for immigration purposes." *Id.* at 226–27. Because we found it "abundantly clear" from the record (e.g., the indictment, guilty plea, and initial restitution order) that the defendant's offense caused a loss exceeding $10,000, we refused to let the amended restitution order be controlling. *Id.* As with *Munroe*, the circumstances here—which we discuss below—make it "abundantly clear" that the restitution in the court's amended judgment does not reflect the actual loss resulting from Singh's offense. In other words, there is sufficient "conflicting evidence" to justify looking past the restitution order.

Despite *Nijhawan* and *Munroe*, the government contends that Singh is collaterally estopped from challenging the validity of the order. The government bases this argument on the Fifth Circuit's decision in *Patel v. Mukasey*, 526 F.3d 800 (5th Cir. 2008). *Patel*, however, was decided before *Nijhawan*, and its current viability appears tenuous to us. In *Nijhawan*, the Court stated that petitioners, including those challenging restitution orders, "have at least one and possibly

22

two opportunities to contest the amount of loss, the first at the earlier sentencing and the second at the deportation hearing itself." 129 S. Ct. at 2303. Further, the *Nijhawan* Court sided with the government, not because the petitioner was estopped from challenging his restitution order, but because he failed to point to sufficient evidence to cast doubt upon it. *See id.* Unlike the petitioner in *Nijhawan*, the petitioner here has pointed to undisputed facts in the sentencing material that undermine the restitution order's reliability as a measure of actual loss.[15] We will now discuss this evidence.

## 2. Specific Offense Circumstances

At the time Singh committed his offense of conviction (i.e., knowingly making a false statement in relation to Raeback's bankruptcy petition), the money that he failed to disclose was in the custody of the Port Authority and beyond his control. While Singh may have subjectively believed his criminal act would enable him to obtain this money, in reality this was just as impossible as the failed attempt in *Onyido*,

---

[15] This applies to the restitution agreement as well. Although this Court has previously stated that an amount agreed to in a plea agreement provides the definitive measure of loss, we did so in the context of a modified-categorical analysis. *See Alaka*, 456 F.3d at 108; *see also Nijhawan v. Att'y Gen.*, 523 F.3d 387, 394 (3d Cir. 2008) (citing *Alaka* for proposition that where defendant pleads to a specific loss amount, "that amount is controlling"). Since the Supreme Court has rejected using the modified-categorical approach for determining loss under subparagraph (M)(i), *Nijhawan*, 129 S. Ct. at 2302–03, the *Alaka* rule does not limit our inquiry here.

where the BIA accepted that the loss was only intended, not actual. *See* 22 I. & N. Dec. 552. In *Onyido*, the DHS sought to remove the petitioner based on his conviction for filing a false claim with the intent to defraud an insurance company. *Id.* at 553. Onyido was convicted for signing paperwork to process a fraudulent $15,000 claim in the presence of people he believed were insurance agents, but were in fact undercover officers. *Id.* Although the facts are somewhat more complicated here, we find them to be functionally equivalent to *Onyido*. For starters, both cases involve situations where, at the moment the crime was consummated, a government sting operation made any intended benefit impossible. Since the Port Authority had custody of the funds, basic principles of property law precluded Singh from having any capacity to use this money for his benefit.[16] The

---

[16] Based on the facts in the record, Singh would have had no means for obtaining the $54,000 from the Port Authority (the defrauded party) for his personal benefit because a wrongdoer's interest in fraudulently obtained property is voidable, *In re Newpower*, 233 F.3d 922, 929 (6th Cir. 2000); *S.E.C. v. Levine*, 881 F.2d 1165, 1176 (2d Cir. 1989), and subject to a constructive trust, *see In re Am. Motor Club, Inc.*, 109 B.R. 595, 599 (E.D.N.Y. 1990). Although the Port Authority transferred the money to the trustee, this was not for the benefit of Singh. Instead, under the unique rules of bankruptcy, a debtor's estate is deemed to include fraudulently obtained property, so long as the property was not impressed with a constructive trust prior to the commencement of the bankruptcy proceeding. *See generally In re Omegas Group, Inc.*, 16 F.3d 1443 (6th Cir. 1994). The inclusion of fraudulently obtained property in the debtor's estate is *not* for the debtor's benefit. *Id.* at 1452; *see also In*

fact that Singh "agreed" to have this money transferred to the trustee as restitution was thus only a formality—one in which he had nothing to lose, but potentially much to gain.[17]

The impossibility of Singh's intended[18] outcome does not end our inquiry, however, because it is obviously possible that Singh's offense could have still caused actual losses. It is conceivable, for example, that Singh's offense could have produced incidental losses for the bankruptcy trustee by forcing him to spend additional money and time accessing the

---

*re Quality Holstein Leasing*, 752 F.2d 1009, 1013 (5th Cir. 1985). It is designed, instead, to ensure equal treatment of creditors, each of whom "has suffered disappointed expectations at the hands of the debtor." *Omegas Group*, 16 F.3d at 1452.

[17] Singh stood to gain because the restitution agreement increased his chances of getting a non-incarceratory sentence, which was his "fervent" objective. App. at 264. Singh was well aware of this during the sentencing proceedings as he cited the restitution agreement as a factor that "strongly favors a non-incarceratory" sentence. App. at 292.

[18] It bears noting that Singh was only convicted of having an intent to deceive, not an intent to defraud. It is possible, therefore, that Singh's intent may have been based on other considerations besides defrauding the estate; for example, preventing detection of his illicit business arrangement with U.S. Rebar. While this distinction may have a bearing on the tethering analysis, *see Ming Lam Sui*, 250 F.3d at 118 n.12, we need not decide the issue here because there is no actual loss to tether. *See generally Alaka*, 456 F.3d at 106–08 (describing requirement that loss be tethered to actual offense of conviction, not general or acquitted conduct).

25

$54,000. The record, however, does not demonstrate any such loss. Indeed, as the U.S. Attorney conceded in the sentencing memorandum, the trustee "did not expend any substantial additional resources as a result of the defendant's fraud." App at 298–99. Thus, under the metric that federal courts of appeals have used for determining if bankruptcy trustees have suffered pecuniary harm, *Holthaus*, 486 F.3d at 457–58; *Lowell*, 256 F.3d at 465–66; *Paradis*, 219 F.3d at 25, the trustee in this case suffered no identifiable loss.

It is also conceivable that Singh's offense may have resulted in actual losses for the creditors. Had the Port Authority, for example, not learned of Singh's bankruptcy proceedings, the trustee may never have learned about the $54,000, and, consequently, the creditors could have had a smaller estate from which to recover on their claims. Again, however, the record shows that this potential loss did not actually occur, since the Port Authority transferred the funds to the trustee prior to the distribution of Raeback's assets. As noted in the U.S. Attorney's sentencing memorandum, "the bankruptcy trustee will receive the funds which the defendant *attempted* to secrete," and thus, "the defendant's crime *will not affect the ultimate outcome* of the bankruptcy proceedings." App. at 298 (emphases added).

Although Singh's offense did not deprive the *creditors* of assets, the government argues that Singh's offense caused an actual loss by depriving the *trustee*. To support this argument, the government contrasts this case with the intended loss at issue in *Pierre*, where the petitioner was convicted of bank fraud for submitting fraudulent documents to obtain a $500,000 loan from a bank. 588 F.3d at 770. As the government notes, the bank in *Pierre* detected the fraud

26

before loaning any money, and was thus never deprived of any property for any period of time. By contrast, the government argues that Singh's offense deprived the trustee of $54,000 from Raeback's estate.[19] What the government omits, however, is that the trustee, unlike the bank in *Pierre*, was not a party that stood to lose from the deprivation itself (as compared to the incidental effects thereof). Instead, the only people who stood to lose were Raeback's creditors, and thus the deprivation should be assessed against them, not the trustee. Accordingly, because the creditors were not deprived of *any* property for *any* length of time, the fact that the trustee was temporarily unable to access all of Raeback's assets does not constitute an actual loss to an actual victim.

While the government is correct that the creditors may have suffered a loss if Singh was never caught, the same is equally true for the potential victim in *Pierre*. Indeed, the government's argument that Singh should not benefit from the fortuitous fact that he was caught before his creditors were harmed overlooks the reality that such fortuitous facts are inherent to all *intended* loss. While an intended loss may

---

[19] The government supports this result by applying the test we established in *United States v. Feldman*, 338 F.3d 212 (3d Cir. 2003) for calculating actual loss for restitution purposes. Under *Feldman*, actual loss is measured by comparing "what actually happened with what would have happened if [the defendant] had acted lawfully." 338 F.3d at 221. We need not address *Feldman* here, however, because even if we assume it is appropriate in the removal context, it would not change the result in this case for the reasons stated above.

27

itself provide grounds for removal,[20] we are bound here to follow the statutory language of subparagraph (M)(i), which requires actual loss.

Finally, we wish to make clear that our conclusion does not mean, as the government contends, that an alien defendant can avoid a finding of actual loss for removal purposes simply by paying restitution after getting caught. Indeed, we agree with the government that payment of restitution should not, and does not, negate a loss that actually occurred. Our holding here is a narrow one, involving an offense that *at no point* resulted in an actual loss to *any* victim for *any* length of time. To highlight the narrowness of this rule, consider the result in a situation like *Pierre* had the bank not detected the fraud. If a bank gives a person a loan under false pretenses, then no matter how soon afterwards it detects the fraud, whether one minute or one year, an actual loss results because the person obtains possession of the loan at the direct deprivation of the bank. It doesn't matter how fleetingly the person obtains control. If the person's offense deprives the defrauded party of property, an actual loss occurs to an actual victim under subparagraph (M)(i).

Contrary to the government's suggestion at oral argument, therefore, nothing in this opinion will change the result in *Nijhawan* and other cases where restitution was paid after the petitioner's offense caused an actual loss. In *Nijhawan*, the petitioner was convicted of a fraudulent scheme that deceived banks into giving over $100 million

---

[20] As noted earlier, we need not decide today whether intended loss satisfies the loss requirement for deceit offenses charged under subparagraph (U). See *supra* note 7.

dollars to the petitioner and his co-defendants. 523 F.3d 387, 389 (3d Cir. 2008). Unlike the situation here, there was no government sting operation that doomed the scheme from its inception, the petitioner obtained control of the money, and the victims that stood to directly lose from being deprived of the money (i.e., the banks) were in fact deprived. Irrespective, therefore, of whether the petitioner in *Nijhawan* paid full restitution for his crime, nothing in this opinion would change the outcome of that case, nor others like it.

In summary, the undisputed circumstances of this case show that a government sting operation (a) doomed any intended benefit when the crime was committed, and (b) prevented any potential or incidental losses from in fact occurring. This observation is the same whether we focus our inquiry at the time the court ordered restitution; at the time Singh was charged; or, as, the government implores us, at the time Singh committed the offense. At any of these times, the record shows that: (a) a government entity (the Port Authority) had custody of the money; (b) Singh had no capacity to obtain this money for his personal benefit; (c) the trustee's personal compensation had not been affected; and (d) the creditors had not been deprived of any property for any length of time. Under this set of circumstances, we find that no actual loss occurred.

## E.     Additional Considerations

Since the government has failed to provide clear and convincing evidence that Singh's offense caused an actual loss exceeding $10,000, Singh is not removable under subparagraph (M)(i). Although it is possible that Singh may be removable under subparagraph (U), the DHS only charged

him under (M). This is important because Singh has a due process right to receive notice of "[t]he charges against [him] and the statutory provisions alleged to have been violated." 8 U.S.C. § 1229(a); *see also United States v. Torres*, 383 F.3d 92, 104 (3d Cir. 2004) (stating that, under the Constitution, aliens have right to receive "notice of the charges" against them and a "fair opportunity to be heard"). Further, since removability under (U) would involve questions that neither Singh nor this Court have had an opportunity to address, it appears that a *sua sponte* invocation of (U) at this late stage in the litigation would prejudice Singh's rights. *See Pierre*, 588 F.3d at 776–77 (holding that BIA's *sua sponte* invocation of subparagraph (U) as basis for removal violated petitioner's due process rights); *see also Ming Lam Sui*, 250 F.3d at 113–19 (addressing questions unique to a removability analysis under subparagraph (U)). Our inquiry here, therefore, is at its end.

## IV. CONCLUSION

For the foregoing reasons, we will grant Singh's petition for review and vacate the BIA's order of removal.